Estate of Mary K. Miller, Anna Lee Klepper and Grace E. Pease, Co-Executrices v. Commissioner. Estate of M. Lucile Murton, Deceased, The United States National Bank of Portland (Oregon), Executor v. Commissioner.
Estate of Miller v. Commissioner
Docket Nos. 65411, 70564.
United States Tax Court
T.C. Memo 1959-235; 1959 Tax Ct. Memo LEXIS 14; 18 T.C.M. (CCH) 1127; T.C.M. (RIA) 59235; December 14, 1959
*14 The fair market value of minority interests in a closely held corporation determined. Charles P. Duffy, Esq., for the petitioner in Docket No. 65411. Gordon H. Keane, Esq., 1430 American Bank Building, Portland, Ore., for the petitioner in Docket No. 70564. Melvin L. Sears, Esq., and Walter I. Auran, Esq., for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: The respondent has determined the following deficiencies in Federal estate taxes: Date of Death
Amount
Est. of Mary K. Miller
Nov. 15, 1952
$40,716.69
Est. of M. L. Murton
Feb. 22, 1955
29,070.64
The sole issue is the determination of the fair market value of certain closely held corporate stocks owned by each decedent at her death. Findings of Fact Some of the facts have been stipulated and are so found. Mary K. Miller, a resident of Portland, Oregon, died testate on November 15, 1952. She was survived by three daughters, whose names are Grace E. Pease, Anna Lee Klepper and Eva Emery Dye Powell. Anna Lee Klepper and Grace E. Pease are the coexecutrices of the Estate of Mary K. Miller, which is being probated in the Circuit Court of *15 the State of Oregon for Multnomah County. The Federal estate tax return for Mary K. Miller, deceased, was filed with the director of internal revenue for the district of Oregon, and the decedent's estate was valued at her date of death. The gross estate of Mary K. Miller included 286 1/4 shares of the stock in Miller Mercantile Company, an Oregon corporation, and hereinafter referred to as Miller's. The value of this stock was reported, for estate tax purposes, at $850 per share, or a total of $243,312.50. By his statutory deficiency notice the respondent determined this value to be $1,350 per share. M. Lucile Murton, a resident of Portland, Oregon, died testate on February 22, 1955. The executor of her estate, which is being probated in the Circuit Court of the State of Oregon for Multnomah County, is the United States National Bank of Portland. The Federal estate tax return of M. Lucile Murton, deceased, was filed with the director of internal revenue for the district of Oregon, and the decedent's estate was valued at the date of her death. The gross estate of M. Lucile Murton included 135 1/2 shares of Miller's stock, and the reported value of this stock, for estate tax purposes, *16 was $833.93 per share, or a total of $112,997.52. By his statutory deficiency notice the respondent determined this value to be $1,600 per share. Miller's was organized in 1909 to take over the expanding department store business of the Miller family which had started in 1902. As the business grew, and from time to time, Miller's acquired other department stores in nearby cities, frequently through the issuance of its stock to the former owners. The Murton, Sisson and Meyers families acquired stock of the company in this manner. Shares of stock were also acquired by Miller's general counsel and employees and managers of the various stores. On the critical dates of November 15, 1952, and February 22, 1955, Miller's operated a chain of 13 retail stores in the States of Oregon and Washington, handling a general line of dry goods, including notions. hosiery, underwear, men's furnishings, shoes, women's coats, suits and dresses, all in the medium price range, and some appliances. Many of the stores lease space to dealers in furniture and other hard goods, and Miller's stores are generally known as department stores. Miller's also controls two wholly-owned subsidiary corporations, *17 each of which operates one similar retail store, namely, Harris Brothers, Inc., a Washington corporation with a store in Olympia, Washington, and The Woman's Store, an Oregon corporation, with a store in Klamath Falls, Oregon. A third wholly-owned subsidiary corporation, Miller Brothers Company, Incorporated, functions as a wholesale house, and approximately 30 per cent of its sales are made to Miller's. Miller's retail outlets are located in the Hollywood section of Portland and at Albany, Eugene, McMinnville, Roseburg, Newberg, Salem and Vernonia, Oregon, and at Everett, Mt. Vernon, Port Angeles, Wenatchee and Yakima, Washington. Miller's owns the store buildings in Eugene and Klamath Falls, Oregon, but leases the premises with respect to the other stores. Miller's has always been a closely held corporation, with ownership of its one class of $100 parvalue stock largely restricted to the families of the original founders. Miller's stock has never been listed on any exchange and there has never been any public trading in it. This stock was not readily salable in the open market, and was not bought or sold except in limited transactions involving the company and its stockholders. *18 The shareholders of Miller's on November 15, 1952, and February 22, 1955, had holdings and the percentage of stock ownership as follows: Nov. 15, 1952
Feb. 22, 1955
Percent
Percent
Name
Shares
of Total
Shares
of Total
L. A. & Floyd Miller Family
(8 individuals
and 1 trustee)
537
23.13%
554
25.70%
W. Frank Miller Family (9
300
12.93%
316
14.53%
individuals)
Mary K. Miller
286 1/4
12.34%
Mary K. Miller Family (4
individuals, includ-
ing Mary K. Miller)
362 3/4
15.63%
208-6/8
9.61%
M. Lucile Murton
78
3.36%
135 1/2
6.21%
Murton Family (6 individuals,
including M.
Lucile Murton)
273
11.77%
275
12.72%
Sisson Family (5 individuals
302 1/2
13.04%
237 1/2
11.25%
and 1 estate)
Meyers Family (1 individual
153
6.59%
153
7.00%
and 1 trustee)
General Counsel, employees
and former em-
ployees (16 individuals)
392
16.91%
410
19.19%
Total Holdings
2,320 1/4
100.00%
2,154 1/4
100.00%
The comparative consolidated balance sheets of Miller's for the years 1947 to 1955, inclusive, have been stipulated. They show, inter alia, that shares outstanding and their book values were as follows: Number
Book Value
Year
of Shares
Per Share
1947
2,320 1/4
$ 787.06
1948
2,320 1/4
958.58
1949
2,320 1/4
1,049.18
1950
2,320 1/4
1,315.32
1951
2,320 1/4
1,405.59
1952
2,333 1/4
1,353.97
1953
2,214 1/4
1,448.21
1954
2,154 1/4
1,634.60
1955
2,239 1/4
1,564.99
*19 Additional operating ratios and data concerning Miller's for the years 1947 to 1955, inclusive, are as follows: PER SHARE
Earnings
Earn-
Net
Net
Net
as Per
ings
Sales
(000's)
Officers'
Current
Cash
Cent of
as Per
Year
(000's)
Income
Salaries
Earned
Paid
Assets
Assets
Capital
Cent
of
Sales
1947
$7,477
$409.1
$16,800.00
$176.29
$24.00
$ 600
$132
22.4%
5.5%
1948
7,926
453.7
19,400.00
195.52
24.00
670
143
20.4
5.7
1949
7,310
265.9
20,700.00
114.59
24.00
721
199
10.9
3.6
1950
7,847
393.3
21,200.00
169.50
24.00
1,000
314
12.8
5.0
1951
8,006
281.6
22,660.00
121.38
24.00
1,079
470
8.6
3.5
1952
8,082
206.8
22,685.71
88.62
24.00
1,044
474
6.6
2.6
1953
8,264
197.0
31,310.00
88.96
30.00
1,130
467
6.2
2.4
1954
8,503
230.6
34,365.00
107.04
30.00
1,336
655
6.6
2.7
1955
8,550
190.0
41,455.00
84.86
34.00
1,318
640
5.4
2.2
1947-1951 Average Earnings Per Share - $155.46 1948-1952 Average Earnings Per Share - $137.92 1950-1954 Average Earnings Per Share - $115.10 The *20 book values of the stock of Miller's, as referred to in the minutes of the annual meetings of the stockholders and reported therein for the benefit of the stockholders, were computed from unconsolidated figures and hence consistently understated the company's true position and represented misinformation during the period 1947 through 1955. No outside audit of Miller's was made during this period. The book values (per share) reported to the stockholders, the stipulated book values, and the understatements for the years 1951 to 1954, inclusive, are as follows: Reported
Stipu-
Understatement
Book
lated Book
Per
Date
Values
Values
Amount
cent
12/31/51
$1,151.73
$1,405.59
$253.86
18.06
12/31/52
1,208.02
1,353.97
145.95
10.78
12/31/53
1,256.84
1,448.21
191.37
13.21
12/31/54
1,318.30
1,634.60
316.30
19.35
The sales and pre-tax earnings record of Miller's Salem store for the period from 1947 to 1955, inclusive, follows: Year
Sales
Pre-Tax Earnings
1947
$1,351,000
$153,000
1948
1,506,000
159,000
1949
1,371,000
108,000
1950
1,323,000
125,000
1951
1,303,000
84,000
1952
1,254,000
90,000
1953
1,309,000
77,000
1954
1,338,000
41,000
1955
1,229,000
36,000
*21 Several Portland stores entered Salem during the early 1950's. Roberts Brothers bought out the Worth's store in Salem in 1950, 1951 or 1952, and developed it from one to two locations. Lipman-Wolfe & Co. opened a branch store in Salem during September of 1954. In the fall of 1954, it was known that Meier & Frank Co., the largest department store in Portland, would also open a branch store in Salem, and it was opened in October of 1955. The board of directors of Miller's, during the years 1952 to 1955, inclusive, was composed of L. A. Miller, Floyd E. Miller, W. Frank Miller, C. W. Weaver and E. F. Lee. On November 15, 1952, L. A. Miller was president and his son, Floyd E. Miller, was vice president. Floyd E. Miller became president prior to the December 2, 1952, meeting held by Miller's board of directors and has continued in that capacity to the present time. W. Frank Miller, cousin of Floyd E. Miller, was secretary and director, and later vice president, of Miller's. C. W. Weaver and E. F. Lee were managers of the McMinnville and Yakima stores, respectively. They were elected to serve on the board of directors during this period because of their fine records as managers of their *22 respective stores. In late 1952, Miller's was approached by Allied Stores, Inc., with what probably amounted to an "offer to deal" on the sale of Miller's to Allied. No definite offers were ever made. Minutes of a directors' meeting of Miller's held on December 2, 1952, contain the following: "President F. E. Miller * * * [made] comments * * * which * * * brought out so very clearly the company's unwritten, projected program beginning with the inflationary World War II Period, that the directors were unanimous in the agreement that a digest of this deliberation should be embodied in the minutes of this meeting. The digest follows: "Approaching this inflationary war period and recognizing the various effects it would have on future business operations, our company was faced with one of three choices. These were: "Choice No. I: To sell out the company at a fancy price and liquidate. We had this opportunity and turned it down." Miller's has always carried national brands and quality merchandise. In the years 1947 to 1955, inclusive, it maintained fair competitive prices, and its policies were approved by the customers. Miller's had approximately 500 employees during the years *23 1947 to 1955, inclusive, and the company enjoyed good employee relations. Miller's maintained a high rating with the United States National Bank and the First National Bank of Portland, and in 1952 and 1955 enjoyed unsecured lines of bank credit approximating one million dollars. After World War II, Miller's adopted a conservative dividend policy in order to pay regular dividends, accumulate a surplus for growth, modernization and expansion, and to provide a cushion against the inflationary postwar conditions. [1] Based on this policy, Miller's board of directors repeatedly declared a 2 per cent monthly dividend on the $100 par value of Miller's stock (amounting to $24 each year) from 1949 up to, but not including, its September 1, 1953, meeting. On that date it declared one monthly dividend of 4 per cent, apparently as a result of the pressure and insistence of some of the stockholders. *24 The minutes of the meetings held by Miller's board of directors prior to 1952 contain no comments with respect to purchases, sales, or valuation of Miller's stock. In 1952, for the first time, Miller's made an attempt to create a market for its stock and to determine its value. The question was raised at the March 10, 1952, stockholders' meeting, and is reflected in the minutes of that meeting which state, in part, as follows: "Under the item of new business, Mr. Clarence Murton brought up the question of the value of the stock in the case of closing an estate. At the present, in appraising an estate, the book value is taken, rather than market value. It was his attorney's suggestion that the company should offer a small amount of stock on the open market in order to establish a stock market value. The book value of the stock at present is $1,151.73, excluding the treasury stock. It was thought best to consult Mr. Jacobs as to whether or not there is any way of getting this down for appraisal purposes. After much informal discussion, it was moved by Mr. Floyd E. Miller, that the Board of Directors should make a study of the value of the stock in relation to its value in event of *25 appraisal and that the Board of Directors be empowered to act upon the results of their findings. Mr. Carl Miller seconded the motion, and its was passed when put to a vote." On November 18, 1952, Miller's sent out questionnaire to each of its 39 stockholders requesting information concerning the value of its stock. The questionnaire dated November 18, 1952, read as follows: "We are trying to get additional information regarding the establishing of the value of Miller Mercantile Company Stock, and are therefore asking each stockholder his opinion on the following questions. "1. In the event that the company should sell some shares of stock, would you want to buy any? YES NO "2. How much would you be willing to pay for it?… "3. How many shares would you be willing to buy at the price you quote in answer to question number two?… The present book value of the stock is $1,151.73 as of December 31, 1951." [2]
Miller's received 16 replies to the above questionnaire. Six were wholly *26 negative and the other 10 contained the following information: Price he
Number
was will-
of shares
ing to pay
he was
per share
willing
Name of Stockholder
of stock
to buy
Clarence C. Murton
$300
10
F. W. Gerke
300-325
15-20
Mr. & Mrs. Floyd E. Miller
600
5
W. F. and Mary E. Miller
575
20
Carl H. and Erma Miller
500
None
Earl F. Lee
400
None
Robert Jacob
500
10
Mrs. Lillian Smith
500
2
C. W. Weaver
500
5
Mabel Gould
500
2
On December 9, 1952, as a result of the above questionnaire, the company sold 13 shares of Miller's stock to the following individuals at $500 per share: Name
No. of Shares
Robert Jacob
2
Mabel Gould
2
Lillian Smith
2
W. F. Miller
2
Dolores Bailey
2
C. W. Weaver
2
Earl F. Lee
1
The other action taken by the board of directors of Miller's is summarized in their report to the stockholders dated March 9, 1953, which, in part, states the following: "At the last meeting held March 10, 1952, you directed the Board of Directors to make a study of the value of the stock in relation to its value in event of appraisal, and that the Directors be empowered to act upon the results *27 of their findings. We gave this matter much study and survey and talked to three different parties on this subject. We had a special meeting with Foster and Marshall who are in the stock and bond business and their suggestion was that the stock could be split 100 to 1 which would make it easier for people to buy a share of stock. If this had been done, they said that we could anticipate having probably from 500-700 additional stockholders. Moreover, if this had been done, the stock would not have sold at the present rate of dividends. Then if the dividends were increased, and business declines and profits narrow, as is obviously the present trend, we would not continue the payment of dividends, and when that time comes the stockholders would be most unhappy. Foster and Marshall would be happy to put the stock on the public market, however, it would cost the company about $50,000.00. Therefore, taking everything into consideration, the Board of Directors decided to not place the stock on the market. We preferred to keep the company a closed corporation held mostly by the families of the original founders of the company, as this is a part of the history and tradition of the Miller Mercantile *28 Company. "We then held a conference with Mr. Jacob and after much discussion, we were of the same opinion about putting our stock on the market as we were after our meeting with Foster and Marshall. It was suggested that we could split the stock 10 to 1 if it would help some stockholder in the event that he wished to dispose of some stock. It is the history of the Miller Mercantile Company that stock does not change hands." The Estate of Mary K. Miller had to raise approximately $100,000 in order to pay Federal estate taxes, Oregon inheritance tax, and other expenses. To raise this money it was necessary to borrow or to sell a portion of decedent's holdings of Miller's stock. In her will, Mary K. Miller had expressed the wish that her Miller's stock be kept in the family and that it be sold only if necessary to pay debts of the estate. Decedent's daughters and heirs-at-law, namely, Anna Lee Klepper, Grace Pease and Eva Emery Dye Powell, wanted to keep the stock in the Miller family and to comply with decedent's wishes, if possible. Mary K. Miller's daughters approached several of their friends in an informal and casual manner in an attempt to sell them some of the Miller's *29 stock held by the estate of their mother and also to get some advice about selling said stock. These friends, many of whom were in the banking business, declined to purchase any of the Miller's stock, and some advised that it would be best to sell the stock to Miller's rather than try to sell it to outsiders, because there was no market for it. Aside from this minor effort, the daughters of Mary K. Miller left the entire matter of the valuation of the Miller's stock and the negotiations for its sale in the hands of J. Robert Patterson, hereinafter referred to as Patterson, attorney for the Estate of Mary K. Miller. The board of directors of Miller's, anticipating that the Estate of Mary K. Miller was going to apply for a loan, adopted the policy at its April 7, 1953, meeting that no loans would be made to any stockholder of the company. Prior to the adoption of this policy, there had been no formal restrictions on loans to stockholders, and several such loans had been made. Also on April 7, 1953, Patterson appeared before the board of directors, and offered to sell decedent's stock to the company for $1,000 per share. On April 24, 1953, the company sent a questionnaire to each *30 stockholder concerning Patterson's offer to sell stock to the company. This questionnaire read, in part, as follows: "Some stock held by the Mary K. Miller estate has been offered for sale. The book value of the stock as of December 31, 1952 was $1,208.02. [3] It has been appraised at $1,172.00. They desire to sell the stock for $1,000 per share. "Will you please answer the following question and mail your reply back to this office so that we have it not later than May 5, 1953: "How many shares of stock will you buy at $1,000.00 per share? " Replies were received from 21 stockholders, none of whom wished to buy. On May 5, 1953, Patterson, acting on behalf of the Estate of Mary K. Miller, requested a loan of $100,000 from Miller's to be secured by 125 shares of its stock. The newly formed policy of April 7, 1953, was invoked and the application was rejected. On June 2, 1953, Patterson reported to Miller's board of directors that he had been unsuccessful in obtaining a loan *31 at the bank on the security of Miller's stock because of lack of provision for repayment of said loan. On June 23, 1953, the board of directors held an informal meeting for the purpose of trying to determine a fair price for Miller's stock. The larger stockholders, holding well over half of Miller's stock, were invited to attend this meeting. The smaller stockholders were not invited to attend the meeting and no consideration was given to them. At this meeting Patterson stated that the estate wanted to sell 154 shares of stock to the company at $1,000 per share. The president, Floyd Miller, replied that the company would not buy any shares at that price but that it was willing to pay $500 per share. The corporate minutes covering the meeting of June 23, 1953, read, in part, as follows: "After much discussion, it was decided by all present that seven hundred dollars ($700.00) per share would be a fair price for the company to pay for any stock purchased, and a price which would be fair to anyone selling their stock." Although those stockholders who were on Miller's board of directors were well informed as to the financial affairs of that company, no financial data was made available *32 to the other stockholders at this meeting. In determining the above-mentioned $700 price per share for Miller's stock, those present at the meeting did not consider Miller's financial status but relied upon their own judgment. Immediately after the price of $700 per share was decided upon, a motion was made at the meeting to buy 154 shares of Miller's stock from the Estate of Mary K. Miller at $700 per share. On July 14, 1953, 1 day prior to the date upon which its Oregon inheritance tax was due, the Estate of Mary K. Miller sold 154 shares of Miller's stock to that company at $700 per share. On the same day Miller's and the Estate of Mary K. Miller entered into an oral agreement, whereby the latter was given the right to repurchase any or all of the stock at the same price of $700 at any time within 3 years. Miller's held this stock as treasury stock. On August 5, 1953, Miller's sent a questionnaire to each stockholder inquiring how many shares of its stock each would be willing to purchase at $700 per share. The Directors Report to The Stockholders, dated March 8, 1954, contains, in part, the following with respect to these questionnaires: "In July of 1953, the company bought *33 one hundred and fifty-four shares (154) of stock from the Mary K. Miller Estate, paying seven hundred dollars ($700.00) per share. During the year, stock was offered for sale to the stockholders in accordance with a motion passed at the last annual meeting. As the result of this offer, thirty-five (35) shares of stock were sold to various stockholders at seven hundred dollars ($700.00) per share. The reason for sending out questionnaires and selling some stock was to try to establish a market price to see if it would assist those who were trying to settle estates." Letters offering to sell up to 100 shares of its stock, at $700 per share, were sent by Miller's to each of its stockholders on August 2, 1955, and September 14, 1956. The purchases and sales of the stock of Miller's for the years 1943 to 1957, inclusive, are as follows: Number
Sales Price
Date
Seller
Purchaser
of Shares
Per Share
May 1943
Harry U. Miller Estate
Company
233
$227.31
May & June
Company
W. Frank Miller
233
227.31
1943
and
other
stockholders of
the Company
September 1943
G. O. Miller Estate
Company
514 3/4
227.31
Sept. to Dec.
Company
Anna Lee Klepper
167 1/2
227.31
1943
and
other
stockholders of
the Company
May 1945
J. A. Souther
Company
13
350.26
Total shares purchased and sold prior to 1952
1,161 1/4
(November 15, 1952 - Date of death of Mary K. Miller)
December 9,
Company
Robert Jacob and
13
500.00
1952
other
stockholders of
the
Company
July 14, 1953
Mary K. Miller Estate
Company
154
700.00
September 1953
Company
C. C. Murton and
35
700.00
other
stockholders of
the
Company
August 1954
Brown E. Sisson Est.
Company
60
700.00
October 1954
Mrs. B. E. Sisson
Fred Lund
5
700.00
267
(February 22, 1955 - Date of death of M. Lucile Murton)
Sept. 1955 to
Company
Ida West and
85
700.00
other stock-
Jan. 1956
holders of the
Company
January 1956
Grace Pease
Frank Miller
6
700.00
Oct. & Nov.
Company
Ida Righton and
85
700.00
1956
other
stockholders of
the
Company
January 1957
Company
Stuart Compton
30
700.00
and
other
stockholders of
the Company
September 1957
Grace Pease
W. F. Miller and
4
700.00
other
stockholders of
the
Company
Total shares purchased and sold in years 1952 to 1957
477
*34 Miller's did not attempt to sell any of its stock to persons other than its stockholders. At no time did the management of Miller's seriously contemplate the sale of corporate stock to the public, the sale of corporate stock to the public, the sale of the corporate assets, or a liquidation of the company. The fair market value of the 286 1/4 shares of the stock of Miller's was $860 per share on November 15, 1952. The fair market value of the 135 1/2 shares of the stock of Miller's was $875 per share on February 22, 1955. Opinion The determination of the fair market value of minority stock interests in a closely held corporation is, at best, extremely difficult. This determination is one of fact, and it must be based solely upon the record before us. Any attempt to analyze prior valuation cases in order to derive some postulatic rule of law applicable to the case before us is fruitless, and citing a case with an analogous fact pattern in support of a particular factual contention is not conclusive. (C.A. 9, 1955), affirming a Memorandum Opinion of this Court [. However, prior cases do indicate the *35 relevant criteria to be considered, and their relative importance. On brief, the Estate of Mary K. Miller contends that the fair market value of 286 1/4 shares of Miller's stock on November 15, 1952, was $500 per share, and the Estate of M. Lucile Murton contends that the fair market value of 135 1/2 shares of Miller's stock on February 22, 1955, was $600 per share. Respondent contends, also on brief, that the fair market value of said stock was $1,150 per share and $1,200 per share on those dates instead of $1,350 and $1,600 as determined in his deficiency notices. Fair market value has repeatedly been defined as the price at which property would change hands in a transaction between a willing buyer and a willing seller, neither being under compulsion to buy or sell and both being informed. (C.A. 8, 1952). In determining the fair market value of an asset, "All the evidence, bearing on the ultimate fact, must be considered." . As was aptly stated in the case of : "The method of valuation is in itself unimportant, *36 so long as it gives due regard to all the facts and relevant evidence, and results in a value which has a reasonable relation thereto. There may be no slavish adherence to a formula * * *" In valuing the unlisted stock of a closed corporation, we must consider the relevant financial data of that corporation, such as its past and expected future earnings, dividend-paying capacity, dividends actually paid, financial liquidity and stability, management salaries, book value of the stock and the portion of book value composed of cash and quick assets. Some of the other factors related to the corporation that must be given consideration are the price at which the stock in question has been sold and the circumstances surrounding such sales, the nature of the business of the corporation and its cyclical fluctuations, the policies of the corporation's board of directors and whom individual directors represent, the distribution of its stock, and the percentage of the shares in question to total stock outstanding at the critical date. Consideration must also be given to general economic conditions and outlook, trends in the industry of which the corporation is a part and its relative position *37 in that industry, the desirability of the stock in question in the open market, and all other significant factors. ; (C.A. 8, 1956), affirming a Memorandum Opinion of this Court [; ; ; ; and Respondent's arguments are based primarily upon the book value of Miller's stock, the relatively large proportion of said book value comprised of cash and other quick assets, and the increases in each of these factors during the years 1947 through 1955. We have carefully considered such factors, but it is axiomatic that increasing liquidity does not necessarily equate with growth or increasing strength. We have also considered that during these same years the trend of Miller's gross profits and net income was downward even though its sales were increasing. Petitioners argue that the actual sales prices of Miller's stock should be viewed as the best evidence of its fair market value. *38 But the sales price of stocks sold under abnormal circumstances, "such as sales of small lots, forced sales, and sales in a restricted market," does not signify the fair market value of such stock. (C.A. 3, 1928). In determining whether certain sales are at arm's length and under normal conditions, all the circumstances surrounding them must be viewed. . In , we stated the following: "The mere fact of one or more sales of stock at a given figure does not in itself prove that to be its fair market value. The circumstances in connection with such sales must be considered and if they be shown to have been made under peculiar conditions indicating some inducing cause other than the mutual desire of seller and buyer to make on the one hand an advantageous disposal, and on the other a wise purchase, they can not be considered as determining a fair market value * * *" Considering the limited number of sales, the parties involved and their relationship, the constant sales price and the changing financial picture of Miller's, the *39 avowed purpose behind many of the sales as indicated in Miller's corporate records, the need for funds by the Estate of Mary K. Miller to pay expenses, the fact that it "sold" some of its Miller's stock (reserving the right to repurchase for 3 years) on the day before the Oregon inheritance tax was due and all other relevant circumstances, we cannot find that the petitioners have met their burden of proving that the sales of Miller's stock were at arm's length and under normal conditions. The case before us is easily distinguished from that of the , which is relied on by the petitioners. In the Schroeder case (page 263), a diligent effort was made to uncover prospective purchasers, while here, the record would not support such a finding. The only attempts to sell some of the stock of Miller's to the public were on a casual and informal basis. Therefore, the sales prices of Miller's stock, under the circumstances, cannot be treated as conclusive evidence of that stock's fair market value, but they remain as one of the factors to be considered and the circumstances surrounding the sales go to the weight to be given this evidence. *40 We have carefully examined and analyzed all the evidence contained in the record before us bearing upon the valuation of the stock in question. We have also considered the opinions of the expert witnesses. Based upon our assessment of all the evidence, and giving proper consideration and appropriate weight to all the factors established by it, we have concluded, and found as an ultimate fact, that the value of 286 1/4 shares of Miller's stock on November 15, 1952, was $860 per share and the value of 135 1/2 shares of Miller's stock on February 22, 1955, was $875 per share. Decisions will be entered under Rule 50. Footnotes
1. In attempting to justify its conservative dividend policy, Miller's board of directors listed the reasons for this policy in its report to Miller's stockholders dated March 9, 1953, and there stated the following: Our cash balance as of December 31st. [1952] is $771,289.45. It is always large at this time of the year due to the paid up accounts receivable and after the Christmas selling which this year was $1,232,305.04. Even against this cash, however, there are current liabilities which total $391,857.47, leaving a balance of only $379,431.98 to take care of all the factors just outlined for you. No mention was made of the fact that Miller's December 31, 1952, balance sheet also listed accounts receivable of $614,304 and U.S. Government bonds of $129,000.↩
2. The actual book value of Miller's stock as of December 31, 1951, was $1,405.59 per share. The book value referred to in the questionnaire was understated $253.86 or by 18.06 per cent.↩
3. The actual book value of Miller's stock as of December 31, 1952, was $1,353.97 per share and not $1,208.02 per share as represented to the stockholders in the questionnaire dated April 24, 1953.↩